**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| GETIR US, INC.,<br><br>and<br><br>GETIR PERAKENDE LOJISTIK A.S.,<br><br>                  Plaintiffs,<br>    v.<br><br>JOHN DOE<br><br>and<br><br>getir190.com, a domain name,<br><br>                  Defendants. | Civil Action No. 1:21-cv-1237 |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 1

ARGUMENT ................................................................................................................................. 5

I.     Legal Standard ................................................................................................................... 5

II.    This court has jurisdiction and authority to grant the TRO .................................................. 6

III.   Getir satisfies all elements for injunctive relief .................................................................. 6

    A.   Getir is likely to succeed on the merits of its ACPA claim ............................................ 7

        1.   Getir has a protectable trademark ............................................................................ 7

        2.   Getir190.com is identical or confusingly similar to Getir's marks ............................. 7

        3.   Defendants acted with bad faith intent to profit ....................................................... 8

    B.   Getir is likely to succeed on the merits of its Libel Claim ............................................ 14

    C.   Getir will suffer irreparable harm in the absence of an injunction................................. 17

    D.   The balance of the equities favors Getir....................................................................... 18

    E.   A TRO is in the public interest .................................................................................... 19

IV.    Only ex parte relief will stop Defendant's unlawful conduct ............................................ 20

V.     Expedited discovery is appropriate................................................................................... 20

CONCLUSION............................................................................................................................. 23

**Introduction**

Getir is a grocery delivery business that offers on-demand speedy delivery service for grocery items in addition to a courier service for restaurant food deliveries. It has grown substantially over the past six years and is expanding operations in the United States ███████. Getir's meteoric rise has fueled criticism. But on November 5, 2021, an anonymous Internet user went well beyond criticism by creating a false and defamatory website using Getir's trademarks—Getir190.com—to lure consumers, divert traffic from Getir's legitimate website, and falsely claim that "more than 190 Getir riders have died on the job in Turkey" since 2020 "among 63,000 traffic accidents involving their riders," and that Getir riders have "no rights," "no insurance", and "can expect no sympathy or pay out from the company" if a rider is injured or dies.

In reality, as explained in the accompanying Declaration of Getir CEO Mert Salur, ████ ██████████████████████████████████████████████████. All Getir riders are trained, insured, and protected through Getir policies.

These defamatory and outrageous statements—amplified through the recent distribution of flyers throughout the United Kingdom encouraging the public to view the Getir190 website coupled with YouTube and Vimeo videos—reflect an orchestrated defamation campaign by an anonymous Internet user (or users) to profit off of Getir's good name through the use and tarnishment of Getir's marks. The Anticybersquatting Consumer Protection Act is intended to protect mark owners like Getir, and injunctive relief is necessary to avoid irreparable harm to Getir's reputation and goodwill.

**Factual Background**

Getir US and Getir Perakende Lojistik A.S. (referred to collectively as "Getir") are each wholly-owned subsidiaries of Getir B.V. that offer on-demand speedy delivery service for grocery

items in addition to a courier service for restaurant food deliveries. Using Getir's mobile application, a customer can place an order, which is retrieved by the nearest Getir G-Store, which then prepares the order and delivers it to the customer via an e-bike or e-scooter.

Getir has been wildly successful, and now offers services in more than 35 Turkish cities, 8 UK cities, 2 Spanish cities, 3 Dutch cities, 2 French cities, 2 German cities, 1 Italian city, and 1 Portuguese city. Getir has delivered more than 160 million orders with riders driving more than 800 million kilometers. In 2021, Getir expanded its services to the United Kingdom and Europe and announced plans to expand to the United States in late 2021.

Getir owns the trademark GETIR. As described below, Getir's valid and subsisting trademarks, which appear on the Principal Register in the United States Patent and Trademark Office ("USPTO") and on its website, Getir.com, include the word mark GETIR, the square logo and a circular logo, respectively covered by U.S. Registration No. 6026027 and U.S. Serial No. 90704110.



On November 5, 2021, Getir learned that a website located at www.getir190.com was making false and defamatory statements about Getir and its business practices. *See* **Compl. Exhibit B**. The Getir190 Website contains Getir's marks. The Getir190 Website altered these marks to switch the purple and yellow (making the yellow text purple, and the purple background yellow), and then depict an individual crashing a motorbike and flying off of it, with images of blood coming down from the bottom of the circular logo.



To the immediate right of the altered mark, the Getir190 Website states:

> SINCE 2020, MORE THAN 190 GETIR RIDERS HAVE DIED ON THE JOB IN TURKEY AMONG 63,000 TRAFFIC ACCIDENTS INVOLVING THEIR RIDERS.

> Getir workers in Turkey have no rights and no insurance, exposing them and their families to a life of debt and destitution if they get injured or die on the job. Getir is all smiles for now in Europe and the UK, but slowly and surely the mask is starting to slip.

Further down, the Getir190 Website states:

> YOUR GETIR ORDER COULD KILL A RIDER AND LEAVE A BROKEN FAMILY

> If a driver gets injured or dies, they or their families are left with nothing. The riders have no insurance and can expect no sympathy or pay out from the company. Every Getir driver is a moment away from death, injury and destitution.

The Getir 190 Website also contains an embedded Vimeo video that contains statements similar to those made above.

These statements are outrageously false. There were 190 deaths among ***all*** motorcycle couriers in Turkey since March 2020—not among Getir riders. *See* Idris Emen, *Number of deaths of delivery riders rises tenfold during pandemic*, Huttiyet Daily News, Mar. 6, 2021, *available at* https://www.hurriyetdailynews.com/number-of-deaths-of-delivery-riders-rises-tenfold-during-pandemic-162903. As set forth in the declaration of Getir US CEO Mert Salur ("Salur Decl."), ████████████████████████████████████████████████████. Salur Decl. ¶ 18. Based on industry practice, the number of tragic fatalities of Getir riders is extremely low. Salur Decl. ¶ 19.   This is because Getir has a safety team, dedicated to riders' safety, together with a head safety officer in each jurisdiction, who evaluate traffic infractions and take appropriate action to ensure that unsafe riders are not permitted to continue working with Getir networks. *Id.* As part of this system, Getir (i) provides detailed training and protective gear to all of its riders as part of their onboarding, (ii) tracks the movements of its riders to check their compliance with Getir's safety standards, (iii) does not allow its riders to drive on highways, and (iv) does not allow riders to carry heavy orders (determined based on the technical assessment of the safety team) on two or three wheel vehicles. *Id.* Further, all Getir riders have health insurance, and accident coverage is paid to a rider's beneficiaries in the event of death. Salur Decl. ¶ 18.

This appears to be the start of an orchestrated defamation campaign because Getir has also learned that an individual or individuals have been posting flyers throughout the United Kingdom containing Getir's marks—distorted in the same way as shown above—and directing the public to

the Getir190 Website.  Salur Decl. ¶ 20. At the website, the public is encouraged to share stories about Getir and post links to the website to social media or share the QR code containing a link to the Website (which is also found on the flyers). Salur Decl. Ex. 4. Just on November 6, 2021, the website links to a Vimeo video containing the same marks, and this activity has been picked up in an international news publication. *See* https://kizilbayrak56.net/ana-sayfa/haber/dunya/ingilterede-getir-protestosu (last visited November 6, 2021).  As explained in the declaration of David King, the CEO of Digitalis Media Ltd. and a recognized authority in IT, cyber risk, and online reputation, these actions reflect the hallmarks of a sophisticated attack campaign designed to impact the business success, reputation, and goodwill of Getir, conducted by an individual or multiple individuals using methodologically sophisticated techniques. *See generally* King Decl.

## Argument

Getir seeks emergency *ex parte* relief to stop Defendant's unlawful action, including a (1) temporary restraining order (preventing further cybersquatting through the use of Getir's marks), (2) an account and asset freeze seizure order (to shut down Defendant's domain name Getir190.com), (3) expedited discovery (to find out who is producing this orchestrated defamation campaign), and (4) an order to show cause regarding a preliminary injunction (to prevent further unlawful conduct while the action remains pending).

## I.     Legal Standard

A temporary restraining order is warranted if Getir establishes that (1) it is likely to succeed on the merits of its claims; (2) it will suffer irreparable harm without the order; (3) the balance of the hardships tips in its favor; and (4) the order serves the public interest. *See Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013). Getir establishes all four elements.

## II.        This court has jurisdiction and authority to grant the TRO

Defendant's cybersquatting violates the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), a law enacted in 1999 that established a cause of action for registering, trafficking in, or using a domain name confusingly similar to, or dilutive of, a trademark.

Under 15 U.S.C. § 1125(d)(2)(A), a trademark owner may file an in rem action "against a domain name in the judicial district in which the … domain name registry … is located if … the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c)." To proceed *in rem*, a court must also find that the mark owner either "is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under [Section 1]" or "through due diligence was not able to find a person who would have been a defendant in a civil action under [Section 1] …." 15 U.S.C. § 1125(d)(2)(A)(ii).

Here, there is *in rem* jurisdiction to proceed against the subject *res*, <getir190.com>, in the Eastern District of Virginia: (1) Getir owns the Getir marks; (2) Verisign, the Domain Name <.com> registry, is located in the Eastern District of Virginia; and (3) Getir is not able to obtain *in personam* jurisdiction over a person who would have been a defendant in a civil action under the ACPA because thus far Getir is unable to locate the individual who owns and operates the Getir190.com Website due to anonymous masking indicating an orchestrated defamation campaign.

## III.       Getir satisfies all elements for injunctive relief

**A.      Getir is likely to succeed on the merits of its ACPA claim**

To prevail on a cybersquatting claim under the ACPA, a plaintiff must show there is no genuine dispute of material fact (1) that plaintiff has a protectable trademark, (2) that the domain name is identical or confusingly similar to plaintiff's trademark, and (3) that the defendant had a bad faith intent to profit from the plaintiff's mark. *See B & J Enters. v. Giordano*, 329 F. App'x 411, 416-17 (4th Cir. 2009) (quoting *Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 549 (4th Cir. 2004)).

### 1.      Getir has a protectable trademark

Getir has registered and common law rights in its Getir trademarks. Getir is the owner of the GETIR trademark registration, U.S. Reg. No. 6026027 (registered April 7, 2020). The Getir trademark registration certificate provides Getir with prima evidence of the validity of the Getir mark and its registration, Getir's ownership, and exclusive right to use the Getir mark for specific goods or services. *See U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 524 (4th Cir. 2002); *see also Retail Servs. Inc.*, 364 F.3d at 542 ("[T]he fact that a mark is registered is strong evidence that the mark satisfies the statutory requirements for the distinctiveness necessary for trademark protection."); *see also Zinner v. Olenych*, 108 F. Supp. 3d 369, 387 (E.D. Va. 2015) (acknowledging that a "certificate of registration, alone, is prima facie evidence that his mark was distinctive when Defendants registered the domain name in question").

### 2.      Getir190.com is identical or confusingly similar to Getir's marks

The Getir190.com domain name is nearly identical to Getir's mark. This element requires only an assessment of facial similarity. *See Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 436-37 (4th Cir. 2011) (citations omitted). "A court does not look beyond the domain name to consider the content of the website, and thus the inquiry under the ACPA is narrower than the traditional multifactor likelihood-of-confusion test for trademark infringement." *Wilens v. Doe*

7

*Defendant No. 1*, 2015 WL 4606238, at *13 (N.D. Cal. July 31, 2015) (citing *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004)).

It is well established that the ".com" aspect of the domain name is insignificant. *See Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270-71 (4th Cir. 2001) (rejecting argument that vw.net is not similar to VW mark because of the ".net"); *see also Gum Wand, Inc. v. Gumwand.com*, Civil Action No. 18-cv-00986 (TSE/IDD), 2019 U.S. Dist. LEXIS 60115, at *9 (E.D. Va. Jan. 15, 2019). Here, when disregarding "190.com" in getir190.com," the website is identical to Getir's mark. *See Volvo Trademark Holding AB v. Volvospares.com*, 703 F. Supp. 2d 563, 568 (E.D. Va. 2010) (recognizing that domain name need not be identical to plaintiff's mark). It is thus clear that getir190.com is identical or confusingly similar to Getir's marks.

### 3.    Defendants acted with bad faith intent to profit

The ACPA lists nine factors that a court *may* consider in determining whether a defendant has a bad faith intent to profit from a plaintiff's mark, and a court is not limited to those factors. *Newport News Holdings Corp.*, 650 F.3d at 435; *see also* 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX), (IV)-(VII). The ACPA gives a court leeway to consider the "totality of the circumstances in making the bad faith determination." *Newport News Holdings Corp.*, 650 F.3d at 435. This Court is well-versed in the nine factors, so each is discussed in turn:

#### (a)    *Factor I: No trademark or intellectual property rights*

The first factor considers whether the defendant has any trademark or intellectual property rights in the domain name. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(I). The owner of <getir190.com> has no trademark or intellectual property rights in the getir190.com domain name. Thus, this factor clearly favors Getir.

8

(b) **Factor II: getir190.com is neither Defendant's legal name nor commonly used to identify Defendant**

The second factor considers "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person." *See* 15 U.S.C. § 1125(d)(1)(B)(i)(II). Here, Defendant's legal name is not  <getir190.com>, nor is Defendant commonly known by or as "getir" or "getir190." *See also Venetian Casino Resort, LLC v. VenetianGold.com*, 380 F. Supp. 2d 737, 744 (E.D. Va. 2005) (finding factor satisfied where the domain name was neither legal name of defendant nor the name defendant was commonly known by). This factor favors Getir as well.

(c) **Factor III: No prior use of getir190.com in connection with the bona fide offering of any goods or services**

The third factor considers whether the defendant previously used the domain name in connection with the bona fide offering of any goods or services. *see* 15 U.S.C. § 1125(d)(1)(B)(i)(III). Here, Defendant has no prior use of Getir190.com in connection with the bona fide offering of any goods or services. Getir190.com was registered on October 14, 2021. This factor favors Getir as well.

(d) **Factor IV: Defendant made no bona fide noncommercial or fair use of the mark in a site accessible under getir190.com**

The fourth factor considers whether Defendant has made any bona fide noncommercial or fair use of the mark in the site accessible under Getir190.com. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(IV). "The ACPA does not contain a commercial use requirement, in contrast to Lanham Act trademark infringement which does." *Wilens v. Doe Defendant No. 1*, 2015 WL 4606238, at *13 (N.D. Cal. July 31, 2015). Here, there is no bona fide noncommercial or fair use of Getir's mark. Defendant is not offering any goods or services or any other fair use. Defendant's

sole purpose is to tarnish Getir's reputation through false statements. Websites that create a likelihood of consumer confusion are not protected by the First Amendment.

Getir further notes that Getir190.com is not a gripe site because it is not engaging in truthful criticism or commentary. Instead, it is using Getir's trademarks to spread outrageous falsehoods in an orchestrated defamation campaign—using a .com address in Verisign's registry in Virginia. In all events,

> [G]ripe sites that use the target's trademark in the domain name either identically or in a confusingly similar format… should not be immunized by free speech principles…. Such Web sites rely on confusion caused by the domain name to convey their message, thereby negating any free speech defense…. *The right to disseminate criticism on the Internet cannot trump the public's right not to be deceived by a confusingly similar domain name.*

4 McCarthy on Trademarks § 25:76 (emphasized portion quoted with approval in *Coca-Cola Co. v. Purdy*, 382 F.3d 774 (8th Cir. 2004)).   This is further evidenced by the fact that the site is consistent with similar exploitative methodologies being deployed by commercial or political actors who cloak their activities through the veil of online anonymity. King Decl. ¶ 11.

*Toronto-Dominion Bank v. Karpachev*, 188 F. Supp. 2d 110, 114 (D. Mass. 2002) is instructive. In that case, the defendant was a customer of TD Waterhouse who got in a dispute over an alleged unauthorized "short sale" and "buy to cover," which caused the defendant to lose more than $34,000 and resulted in the closing of his trading account. *Id.* at 111. In response, the defendant registered sixteen domain names that consisted of various misspellings of the name tdwaterhouse.com. *Id.* At those websites, the defendant referred to TD Waterhouse as "webfacism," accused Toronto-Dominion Bank of being involved in white collar crime and compared their business practices to what "Nazi or Soviet Totalitarists did to their victims." *Id.* at 112. Like here, the website encouraged users to share their own thoughts. *Id.* The court granted the plaintiffs' motion for summary judgment against the website creator on their ACPA claim.

In doing so, the court held that the defendant intended to divert customers from plaintiffs' mark by creating confusion regarding the source, sponsorship, or affiliation, of the defendant's site. *Id.* at 114. Moreover, there was no bona fide noncommercial or fair use; rather, "[c]onfusion was [the defendant's] sole purpose in selecting the domain names. [The defendant's] use of the names is not in connection with the offering of goods or services or any other 'fair use.'" *Id.* Thus, there was "no dispute that [the defendant] acted with the intent to 'tarnish or disparage'" the plaintiff's mark, and the defendant was forced to forfeit his interests in the sixteen domain names. *Id.*

The same is true here. Getir190 exists solely to tarnish Getir's valuable trademarks and to spread outrageous falsehoods (expressly attributing the entirety of motorcycle courier fatalities in Turkey to Getir along with other false statements concerning Getir's business practices) at the ████████████████████████████████████. *See* Salur Decl. ¶ ¶ 10-12. Thus, this factor weighs in favor of Getir as well.

> (e)   ***Factor V: Defendant's intent in registering getir190.com was to divert consumers away from Getir.com to a site accessible under Getir190.com that could harm the goodwill represented by the Getir mark***

The fifth factor considers:

> [t]he person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site[.].

15 U.S.C. § 1125(d)(1)B)(i)(V). This factor "is rarely discernable directly, [and] must typically be inferred from the pertinent facts and circumstances." *Prudential Ins. Co. of Am. v. PRU.com,* 2021 WL 2744526, at *7 (E.D. Va. June 30, 2021) (citing *Audi AG v. D'Amato,* 469 F.3d 534, 549 (6th Cir. 2006) and *Carnivale v. Staub Design LLC*, 547 F. App'x 114, 116 (3rd Cir. 2013)). This case

is analogous to the Court's decision in *Karpachev*, discussed above. Here, it can be inferred that Defendant is seeking to use the domain name Getir190 to confuse and divert consumers from the Getir website. If Defendant truly intended to offer mere opinion about Getir's services, Defendant could have created a website such as "GetirStinks.com" (and then offered opinions and criticism instead of outrageous falsehoods). But that is not what Defendant did; Defendant merely added numbers at the end of Getir's valuable mark.

> (f) ***Factor VI: Offers to sell domain name to mark owner or third party for financial gain without having used or intent to use domain name***

The sixth factor considers "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct[.]" 15 U.S.C. § 1125(d)(1)(B)(i)(VI). A formal offer need not even be made to have this factor weigh in favor of a finding of bad faith. *See Zinner*, 108 F. Supp. 3d at 389 ("the tone of such conversation was that 'it would take a lot of money to pay off' Mr. Fernandez's client"); *id.* at 389–90 ("stated interest in selling the domain name and their communication, through Mr. Fernandez, that they 'want[ed] to be paid'—in a conversation with a tone suggesting that Defendants wanted to be paid a lot of money—for the site are sufficient"). Defendant's defamatory website was only purchased less than a month ago, and Getir has no intention of attempting to purchase it and reward Defendant's unlawful behavior. Further, "many cybersquatters are now careful to no longer offer the domain name for sale in any manner that could implicate liability." *E. & J. Gallo Winery v. Spider Webs, Ltd.*, 286 F.3d 270, 275 (5th Cir. 2002). Thus, although there have been no sale offers, this factor is neutral since Defendant only acquired the website recently and has had no contact with Plaintiff.

(g)     ***Factor VII: Defendant's use of hidden contact information when registering getir190.com***

The seventh factor considers the defendant's "provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VII).

Here, Defendant has kept its identity and contact information hidden, and the record devoid of definitive evidence as to who registered Getir190.com. The Court may infer that this lack of definitiveness was intentional. These actions should not be tolerated and compel a finding of bad faith. *See Pro-Concepts, LLC v. Resh*, Civil Action No. 2:12cv573, 2013 U.S. Dist. LEXIS 151714, at *44-45 (E.D. Va. Oct. 22, 2013) (finding factor weighed in favor of bad faith where registrant used his previous name that changed in high school).

(h)     ***Factor VIII: Defendant registered domain names which were confusingly similar to marks of others***

The eighth factor considers whether the defendant's "registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others . . . without regard to the goods or services of the parties." 15 U.S.C. § 1125(d)(1)(B)(i)(VIII). This factor is neutral. Getir does not know whether Defendant has registered or acquired other domain names because Defendant has kept his identity hidden. Getir notes, however, that Defendant has released fliers in the UK, and publicized videos on YouTube and Vimeo repeating the same defamatory statements.

13

        (i)        *Factor IX*: **Getir's marks are distinctive and famous**

The ninth factor considers "the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous." *See* 15 U.S.C. § 1125(d)(1)(B)(i)(IX). Getir's marks are registered, distinctive, and famous. *See Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F. Supp. 2d 612, 626 (E.D. Va. 2002) (finding trademark owner's mark "clearly satisf[ying] this factor as it [was] registered, incontestable, and distinctive"). These registrations provide constructive notice of Getir's rights as a matter of law. 15 U.S.C. § 1072. The marks' appearance on the Getir190.com website in a distorted manner demonstrates actual notice connecting Defendant's use of Getir190.com with Getir.

\*       \*       \*

When considering the totality of the circumstances, the undisputed facts—no matter how much they are viewed in Defendant's favor—show that there is no genuine dispute as to Defendant's bad faith intent to profit from Getir's marks. All factors weigh in Getir's favor or are neutral. Getir is likely to succeed on the merits in its ACPA claim.

**B.**      **Getir is likely to succeed on the merits of its Libel Claim**

Getir is also likely to succeed on the merits of its libel claim. "In Virginia, the elements of libel are (1) publication of (2) an actionable statement with (3) the requisite intent." *Tharpe v. Saunders*, 285 Va. 476, 480 (2013) (citing *Jordan v. Kollman,* 269 Va. 569, 575 (2005)). "To be actionable, the statement must be both false and defamatory." *Id.* (citation omitted). "Whether a statement is an actionable statement of fact or non-actionable opinion is a matter of law to be determined by the court." *Jordan,* 269 Va. at 576. "The requisite intent a plaintiff must provide in a defamation action depends upon the plaintiff's status as a public or private figure and the damages sought." *Id.* A public official must prove that a defamatory statement was made with

14

"actual malice." *Id.* at 576-77 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). In Virginia, a plaintiff must also show that the statements at issue were "of or concerning" him, which is met where the plaintiff shows "that the publication was intended to refer to him and would be so understood by a person reading it who knew him." *Wjla-Tv v. Levin*, 264 Va. 140, 152 (2002) (quoting *The Gazette Inc. v Harris*, 229 Va. 1, 37 (1985)). Statements actionable as defamation *per se* include "[t]hose which prejudice such person in his or her profession or trade." *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 710 (2006) *(*citing *Fleming v. Moore*, 221 Va. 884, 889 (1981).

Here, Getir satisfies all elements. Getir190.com contains published material available for anyone on the Internet to see that states that (1) "Getir brings death in minutes"; (2) "Our riders are dying to serve you"; (3) "Since 2020, more than 190 Getir riders have died on the job in Turkey among 63,000 traffic accidents involving their riders"; (4) Getir workers in Turkey have no rights and no insurance, exposing them and their families to a life of debt and destitution if they get injured or die on the job"; and (5) "If a driver gets injured or dies, they or their families are left with nothing. The riders have no insurance and can expect no sympathy or pay out from the company. Every Getir driver is a moment away from death, injury, and destitution."

These statements are false. In truth, there were 190 deaths among ***all*** motorcycle couriers in Turkey since March 2020—not among Getir riders alone. *See* Idris Emen, *Number of deaths of delivery riders rises tenfold during pandemic*, Huttiyet Daily News, Mar. 6, 2021, *available at* https://www.hurriyetdailynews.com/number-of-deaths-of-delivery-riders-rises-tenfold-during-pandemic-162903. The publishers of Getir190.com know this and thus have actual malice because they cite the study from the Federation of All Anatolian Motorcycle Couriers (TAMKF), yet distort

15

the findings of 190 delivery drivers dying in Turkey since March 2020 to falsely state that 190 Getir delivery drivers died since that time.

As set forth in the Declaration of Getir CEO Mert Salur, ███████████████████ ████████████████████████████████. Salur Decl. ¶ 18. This is because Getir has a safety team, dedicated to riders' safety, together with a head safety officer in each jurisdiction, who evaluate traffic infractions and take appropriate action to ensure that unsafe riders are not permitted to continue working with Getir networks. Salur Decl. ¶ 19. As part of this system, Getir (i) provides detailed training and protective gear to all of its riders as part of their onboarding, (ii) tracks the movements of its riders to check their compliance with Getir's safety standards, (iii) does not allow its riders to drive on highways, and (iv) does not allow riders to carry heavy orders (determined based on the technical assessment of the safety team) on two or three wheel vehicles. *Id.* Further, all Getir riders have health insurance, and accident coverage is paid to a rider's beneficiaries in the event of death. Salur Decl. ¶ 18.

*Muhalsen v. Doe*, No. 17-cv-01575-PAB-KLM, 2017 U.S. Dist. LEXIS 167542 (D. Colo. Oct. 10, 2017) is instructive on this point. In *Muhalsen*, the anonymous defendants posted libelous YouTube videos concerning the plaintiff and his law firm, accusing the defendant of domestic violence, assault, homicide, drug use, and fraudulent legal practices. *Id.* at *2. Even though the defendants' identities were unknown, the Court entered a TRO directing the defendants to remove the libelous content. *Id.* at *4. The court later entered a preliminary injunction and authorized Google and the web hosting company to remove the libelous content. For these reasons, Getir is highly likely to succeed on the merits of its libel claim in addition to its ACPA claim and should take the same action here.

**C.      Getir will suffer irreparable harm in the absence of an injunction**

Getir cannot stop Defendant's orchestrated defamation and tarnishment campaign without *ex parte* relief. If Getir does not get that relief, then Getir, consumers, and its riders will suffer continued irreparable harm. Specifically, Getir will suffer harm to its reputation as a trusted grocery deliverer. Consumers will continue to be tricked, lured into a false sense of guilt that Getir is placing its riders in harm's way. Indeed, the Getir190.com website states: "When you place an order with Getir, for say, some groceries you forgot to buy at the supermarket, you might be unwittingly sending someone to their death." Finally, the object of the campaign—economic damage to Getir—will harm Getir's riders who depend on Getir for their livelihoods.

The timing of <getir190.com>'s launch ███████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████.

This harm is difficult to quantify and irreparable because once consumer trust is eroded, it may never come back. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) (holding that "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied. . . ."); *Arminius Schleifmittel GmbH v. Design Indus., Inc.*, No. 1:06CV00644, 2007 U.S. Dist. LEXIS 10847, at *22 (M.D.N.C. 2007) (finding irreparable harm because defendant's conduct "will have significant and continuous long-term effects"). Courts faced with similar circumstances in the context of phishing cases have consistently held that this harm constitutes immediate and irreparable injury, loss, or damage. *See Microsoft Corp. v. John Does 1*-2, No. 1:16-cv-00993-GBL-TCB, 2017 WL 3605317 (E.D. Va. Aug. 22, 2017) (Lee, J.); *Avvo Inc. v. Liang*, No. 2:16-cv-00892-DLR (D. Ariz. May 11, 2017) (granting *ex parte* temporary restraining order and preliminary injunction, where, as here, the defendant created a mirror website using counterfeits plaintiff's marks to defraud consumers in a phishing scheme); *Microsoft Corp. v. John Does 1-18*, No. 1:13-cv-00139-LMB-TCB (E.D. Va. Apr. 2, 2014) (Brinkema, J.) (same, where defendants used plaintiff's marks to deceive consumers into disclosing private information to malicious "bot" software); *Microsoft Corp. v. John Does 1-27,* No. l:10-cv-00156-LMB-JFA (E.D. Va. Oct. 26, 2010) (Brinkema, J.). Getir's investigation is ongoing, but, at minimum, this orchestrated defamation campaign is threatening Getir with irreparable harm.

### D.     The balance of the equities favors Getir

Getir has suffered irreparable harm, but Defendant will not suffer any harm to any legally protected interest if the Court grants the TRO. Indeed, the imposition of an injunction and the freeze of Defendant's domain name will not harm it in any legally cognizable way, because the

sole purpose of Defendant's activities is to carry out illegal activity to Getir's detriment. Courts consistently find that the balance of hardship tips plaintiff's favor under similar circumstances. *See Avvo Inc. v. Liang*, No. 2:16-cv-00892-DLR (D. Ariz. Apr. 27, 2016) (granting an *ex parte* TRO and noting that the balance of hardships weighed in plaintiff's favor where "issuance of the [TRO] would merely stop Defendants [. . .] from displaying their copy of Plaintiff's website, which contains Plaintiff's intellectual property, and failure to issue the [TRO] would cause Plaintiff to suffer irreparable injury to its intellectual property and reputation and would permit Defendant [. . .] to continue using the Website to steal the personal information Internet users believing they were on Plaintiff's website[.]"); *Microsoft Corp. v. John Does 1-18*, No. 1:13-cv-00139-LMB-TCB (E.D. Va. Apr. 3, 2014) (Brinkema, J.) (granting *ex parte* TRO and seizure order where granting the orders would only prevent unlawful conduct and denying the orders would result in further irreparable harm to plaintiff and its customers).

To the extent the TRO affects third parties, such as domain name registrars, registries, web hosts, or privacy protection services, the inconvenience will be minimal and temporary. Getir narrowly tailored its Proposed Order. Getir simply requests that these third parties take specific actions to dismantle Getir190.com and shut them down until a merits determination. Any burden associated with this is warranted, because third party help is critical to stopping this unlawful campaign.

### E.     A TRO is in the public interest

Defendant has no right to tarnish Getir's marks or mislead the public, but consumers have an obvious right to be free from Defendant's deception. Granting the TRO will protect the public, while denying it will hurt the public by leaving them vulnerable to false and defamatory information. *See Mintel Learning Tech., Inc. v. Beijing Kaidi Educ. & Tech. Dev. Co*., No. 4:06-cv-07541-PJH, 2007 U.S. Dist. LEXIS 103180, at *29-30 (N.D. Cal. Aug. 20, 2007) (noting that

19

each jurisdiction "has a significant interest in protecting the intellectual property of its citizens and businesses from infringement by foreign defendants."). Here, courier delivery service has grown to be a valuable and important part of daily life, especially during the pandemic. It is in the public interest to prohibit demonstrably false information spread in violation of the ACPA.

## IV.     Only ex parte relief will stop Defendant's unlawful conduct

Given the nature and circumstances before the Court, ex parte relief is especially needed. The existing evidence points towards an orchestrated defamation campaign, conducted by a person or persons with finances and a knowledge of tradecraft. They have created a confusingly similar mark (Getir190), they have anonymized their Internet use to make it difficult to track. And they have coordinated such use with physical fliers in the UK, videos on YouTube and Vimeo, and QR codes that link back to their website. The registrant of <getir190.com> has concealed and hidden their identity, so Getir is not able to provide notice and should not be punished for not doing so— especially given the steps it has taken to reach out to the web host. *See* Declaration of Lynsey Schumacher (describing Defendants' efforts to conceal their identity).  Defendant must forcibly be stopped, and a TRO is the only means to do it.

Further, the ACPA expressly provides that remedies in an in rem action such as this "shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. 1125(d)(1)(D)(i). The Court may direct that a registrar, registry, or other domain name authority "not transfer, suspend, or otherwise modify the domain name during the pendency of the action, except upon order of the court." *Id.* That is what Getir seeks here. Getir's request is appropriate because such an order is narrowly tailored, will prevent irreparable harm, and no other remedy is adequate.

## V.     Expedited discovery is appropriate

Getir also requests limited, expedited discovery from third parties, targeted to learning

Defendant's identity, and confirming the locations and instrumentalities of its unlawful operations. Under Federal Rule of Civil Procedure 26, parties may commence discovery before the Rule 26(f) conference if authorized by court order. Fed. R. Civ. P. 26(d)(1). Within this Circuit, district courts have found good cause for expedited discovery when, among other things, the true identity of the defendant is unknown, the moving party alleges infringement, the scope of the discovery sought is narrow, and expedited discovery would substantially contribute to moving the case forward. *See Venice PI, LLC v. Does 1-12*, No. 5:17-cv-00333-BO, 2017 U.S. Dist. LEXIS 129581, at *2 (E.D.N.C. Aug. 15, 2017); *Malibu Media, LLC v. Doe*, No. 14-cv-03948-GLR, 2014 U.S. Dist. LEXIS 175283, at *1 (D. Md. Dec. 19, 2014). Courts have also granted expedited discovery where plaintiffs established irreparable harm, and where plaintiffs are unable to discover defendants' identities except through third-party discovery, such has discovery served on internet service providers. *See, e.g.*, *Hard Drive Prods. v. Does 1-30*, No. 2:11-cv-345, 2011 U.S. Dist. LEXIS 73159, 2011 WL 2634166 (E.D. Va. Jul. 1, 2011).

Separately, under the All Writs Act, 28 U.S.C. § 1651(a), the court may issue all writs necessary or appropriate for the administration of justice. This provision is repeatedly invoked to direct third parties to take narrowly-defined actions to implement court orders. *United States v. New York Tel. Co.*, 434 U.S. 159, 175-76 (1977) (All Writs Act authorized granting an order to a telephone company directing it to assist in the implementation of a pen registrar warrant); *Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991) (affirming the District Court's authority under the All Writs Act to order a monthly accounting because "the order bears a direct relationship to the district court's purpose of monitoring compliance with the freeze order."); *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 338 (2d Cir. 1985) ("An important feature of the All-Writs Act is its grant of authority to enjoin and bind non-parties to an

21

action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction."); *Application of U.S. of Am. for an Order Authorizing an In-Progress Trace of Wire Commc'ns over Tel. Facilities*, 616 F.2d 1122, 1129 (9th Cir. 1980) (upholding an order requiring a third party to provide specific information to the plaintiff; noting that in *New York Tel. Co.* "the Court made the commonsense observation that, without the participation of the telephone company, 'there is no conceivable way in which the surveillance authorized could have been successfully accomplished.'") (citations omitted). Thus, the All Writs Act provides separate authority for granting expedited discovery.

Here, Getir establishes a strong need and good cause for ordering expedited discovery. As set forth above, Defendant took great care to hide its identity to further its unlawful scheme. So far, Getir has only identified Defendant by its domain name. However, the use of privacy protection services means Getir does not know who Defendant really is. The third-party service providers do, however, and could easily share that information with Getir if ordered to do so.

Getir's requested discovery is extremely limited to: (1) contact information used for the domain name registration; (2) any data related to the online registration, including the IP addresses of the relevant user; (3) the names and addresses of the Defendant and the locations of their operations, including identifying information associated with Defendant's websites, and any other domain names they may operate; (4) any and all known Internet websites on which Defendant uses the Getir Trademarks; (5) information on any other accounts linked to the Registrant; and (6) any and all known domain names registered by Defendant. Granting Getir's request for expedited discovery will allow it to more fully identify Defendant and will substantially further this litigation by ensuring that the correct individuals receive proper service of process, reducing the likelihood of time-consuming motion practice related to incorrect identification of defendants. *See Hard*

*Drive Prods. v. Does 1-30*, 2011 U.S. Dist. LEXIS 73159, 2011 WL 2634166, at *2-4 (E.D. Va. Jul. 1, 2011). Moreover, granting this motion will permit Getir and third parties to fully and properly execute relief afforded by the TRO (should the Court see fit to grant it). Thus, Getir's request for limited expedited discovery is reasonable, and supported by the law and good cause.

## <u>Conclusion</u>

For the foregoing reasons, Getir respectfully requests that this court grant its TRO Motion, in its entirety, award the relief set forth in the attached proposed order, and order all other, further relief deemed just or proper.

Dated: November 8, 2021

VENABLE LLP

_____/s/_____
Nicholas M. DePalma (VSB No. 72886)
Kevin W. Weigand (VSB No. 81073)
8010 Towers Crescent Drive, Ste 300
Tysons Corner, VA 22182
Tel: 703-905-1449
Fax: 703-821-8949
nmdepalma@venable.com
kwweigand@venable.com


Roger A. Colaizzi (VSB No. 32651)
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Tel: 202-344-8051
rcolaizzi@venable.com


*Counsel for Plaintiffs*