IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GETIR US, INC., *et al.*,                )
                                         )
      Plaintiffs,                   )
                                         )
      v.                            )     Civil Action No. 1:21-cv-1237 (RDA/WEF)
                                         )
JOHN DOE, *et al.*,                      )
                                         )
      Defendants.                   )
_____  )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Plaintiffs' Motion for Default Judgment. Dkt. 58. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered the Motion, Plaintiffs' Memorandum in Support (Dkt. 59), Plaintiffs' Supplemental Memorandum (Dkt. 65), Magistrate Judge Fitzpatrick's Report and Recommendation (Dkt. 66), and Plaintiffs' Objection to the Report and Recommendation (Dkt. 67), this Court will ADOPT the Report and Recommendation in full, REJECT Plaintiffs' Objection to the R&R, and therefore DENY Plaintiff's Motion for Default Judgment (Dkt. 58) for the following reasons.

1

# I. BACKGROUND

## A. Factual Background[1]

Plaintiffs, Getir U.S. Inc. and Getir Perakende Lojistik A.S. (collectively, "Getir"), offer "on-demand speedy delivery service for grocery items" as well as "a courier service for restaurant food deliveries."   Dkt. 28 (Unredacted Amended Complaint) ¶ 21.   Through Getir's mobile application, customers place an order, which is "retrieved by the nearest Getir G-Store[,]" prepared by that store, and then delivered to the customer by e-bike or e-scooter.  *Id.* ¶ 22.  Getir offers services throughout the world, including in cities in Turkey, the United Kingdom, Spain, the Netherlands, France, Germany, Italy, and Portugal.  *Id.* ¶ 23.  In 2021, Getir announced that it was planning on expanding to the United States.  *Id.* ¶ 25.

Getir owns a trademark, GETIR.  *Id.* ¶ 26.  The trademark includes the word GETIR, a square logo, and a circular logo:



---

[1] In evaluating Plaintiffs' Motion for Default Judgment, the Court takes the well-pleaded allegations of fact in Plaintiffs' Complaint as true.  *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001).

*Id.* ¶ 26.   Getir's marks are covered by U.S. Registration No. 6026027 and U.S. Serial No. 90704110.  *Id.*

A couple of years ago, Getir found out that those trademarks were being improperly used. On November 5, 2021, Getir discovered that a website, www.getir190.com, was making false statements about "Getir and its business practices."  *Id.* ¶ 27.  Specifically, the website contains an alteration of Getir's trademarks, depicting an individual crashing a bike and flying off from it:



*Id.* ¶ 30.  To the "immediate right" of the mark, the website states:

> SINCE 2020, MORE THAN 190 GETIR RIDERS HAVE DIED ON THE JOB IN TURKEY AMONG 630,000 TRAFFIC ACCIDENTS INVOLVING THEIR RIDERS.
>
> Getir workers in Turkey have no rights and no insurance, exposing them and their families to a life of debt and destitution if they get injured or die on the job. Getir is all smiles for now in Europe and the UK, but slowly and surely the mask is starting to slip.

*Id.* ¶ 31.  Further down, it reads:

> YOUR GETIR ORDER COULD KILL A RIDER AND LEAVE A BROKEN FAMILY
>
> If a driver gets injured or dies, they or their families are left with nothing. The riders have no insurance and can expect no sympathy or pay out from the company. Every Getir driver is a moment away from death, injury and destitution.

*Id.* ¶ 32.  The website also contains "an embedded [] video that contains similar statements."  *Id.* ¶ 33.  Getir contends that those statements are false.  *Id.* ¶ 34.

That single website was not all that was aimed at Getir.  On November 5, 2021, flyers were posted "throughout the United Kingdom" using the same imagery as was posted on getir190.com and including a QR code that directed individuals to getir190.com.  *Id.* ¶ 42.  Those flyers were still being posted through 2022.  *Id.* ¶ 43.  The original website also encouraged visitors "to share stories about Getir and post links to the website to social media or share the QR code" that contains the link to the website.  *Id.* ¶ 44.  Later on (two days after Getir filed its original Complaint in this action) a new website emerged—www.190getir.com—stating that "Getir190 is under attack[,]" that "Getir 'brings death in minutes[,]'" and that the "190 casualties were more than Getir delivery drivers."  *Id.* ¶ 46.

### B. Procedural Background

Getir filed its original Complaint on November 28, 2021, along with an Emergency Motion for a Temporary Restraining Order.  Dkt. Nos. 1; 2.  The Court granted the Emergency Motion for a Temporary Restraining Order on November 12, 2021.  Dkt. 20.  Getir then filed an Amended Complaint on November 15, 2021, Dkt. 21, and again filed a corresponding Emergency Motion for a TRO, Dkt. 22, which was granted on November 19, 2021, Dkt. 31.  Getir posted bond for the TRO in the amount of $500 on November 22, 2021.  Dkt. 37.

Getir then filed a Motion for a Preliminary Injunction on December 17, 2021, Dkt. 39, which was granted by this Court on December 21, 2021, Dkt. 41.  On October 12, 2022, this Court asked Getir to show cause why this action should not be dismissed pursuant to Federal Rule of Civil Procedure 4(m), Dkt. 51, and subsequently Plaintiffs (1) dismissed their defamation claims, Dkt. 52; and (2) requested an entry of Default on their cybersquatting claim, Dkt. 53.  After the

Clerk entered default on November 4, 2022, Dkt. 57, Getir filed its Motion for Default Judgment on November 7, 2022, Dkt. 58.

Magistrate Judge Fitzpatrick heard argument on Getir's Motion for Default Judgment on December 9, 2022. Dkt. 63. He then ordered supplemental briefing on January 31, 2023, Dkt. 64, which Plaintiffs filed on February 10, 2023, Dkt. 65. Magistrate Judge Fitzpatrick issued a Report and Recommendation that this Court deny Getir's Motion for a Default Judgment on March 14, 2023. Dkt. 66. Getir objected to that R&R on March 28, 2023. Dkt. 67.

## II. STANDARD OF REVIEW

When evaluating an R&R, a district court employs different standards depending on whether a party has objected. If a party has not objected to the R&R, the court "need not conduct a *de novo* review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note). However, a district court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72.

Rule 55(b)(2) of the Federal Rules of Civil Procedure governs default judgments sought from the Court. In evaluating a Default Judgment Motion, the Court determines "whether the well-pleaded allegations in [the] [C]omplaint support the relief sought." *Ryan*, 253 F.3d at 780. This means that the Court must accept the factual allegations as true and independently determine whether those allegations state a claim under the applicable law. *Id.* This is akin to review pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which asks whether the Complaint "contains plausible claims upon which relief may be granted." *Microsoft Corp. v. John*

*Does 1-8*, No. 1:14-cv-811, 2015 WL 4937441, at *8 (E.D. Va. Aug. 17, 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Court must address one other issue that permeates Plaintiffs' objection to Magistrate Judge Fitzpatrick's R&R.  Repeatedly, Getir refers to this Court's granting of its Motion for a Preliminary Injunction, insinuating that Magistrate Judge Fitzpatrick's R&R flies in the face of that Order.  *E.g.*, Dkt. 67 at 2, 9, 10, 12.  But the granting of that *preliminary* injunction does not inform this Court's evaluation of whether to grant a *permanent* injunction, and for good reason.  A preliminary injunction is just that—preliminary.  As a result, "the merits inquiry in the preliminary injunction context is necessarily abbreviated."  *Smyth ex rel. Smyth v. Rivery*, 282 F.2d 268, 276 (4th Cir. 2002).  So, it is not unusual for courts to deny a permanent injunction to an applicant who was already successful in procuring the exact same injunction on a preliminary basis.  *See, e.g.*, *Sole v. Wyner*, 551 U.S. 74, 79-81 (2007) (reviewing case that granted preliminary injunction and subsequently denied permanent injunction).  This Court does not regard its prior issuance of a preliminary injunction as having much, if any, weight in this situation, as it is now able to thoroughly analyze the alleged facts and applicable law.

## III. ANALYSIS

As a preliminary matter, having reviewed the record, this Court does not find any clear error as to the portions of Magistrate Judge Fitzpatrick's R&R that Getir did not object to. Specifically, Getir did not object to Magistrate Judge Fitzpatrick's findings that (1) this Court has *in rem* personal jurisdiction over the Defendant Domain Names, Dkt. 66 at 3; (2) that this Court does not have personal jurisdiction over the John Doe Defendants, *id.* at 4; (3) that venue is proper in this district, *id.*; (4) and that service was proper pursuant to the relevant statute, *id.* at 4-6. Moreover, Plaintiffs did not object to Magistrate Judge Fitzpatrick's finding that Getir's Complaint

sufficiently alleged facts such that the first two aspects of its cybersquatting claim were met: that it owned a "valid and protectable mark[,]" *id.* at 10-11, and that the domain names are "confusingly similar or identical to" Getir's mark, *id.* at 11-12.  The Court will thus ADOPT those portions of the R&R in full.

Getir only objects to one part of Magistrate Judge Fitzpatrick's R&R: his finding that the Amended Complaint did not sufficiently allege a "bad faith intent to profit" from Getir's mark.  The Court reviews that portion of the R&R *de novo*.

To start, facts indicative of a "bad faith intent to profit" are indispensable to Getir's cybersquatting claim.  Under the cybersquatting statute, a plaintiff can only procure relief if the defendant has "a bad faith intent to profit from [plaintiff's] mark."  15 U.S.C. § 1125(d); *Prudential Ins. Co. of Am. v. PRU.com*, 546 F. Supp. 476, 484 (E.D. Va. 2021) (cleaned up).  Courts generally weigh nine factors in determining whether a defendant has a "bad faith intent to profit:"

> (1) the trademark or other intellectual property rights of the [alleged cybersquatter], if any, in the domain name;
> (2) the extent to which the domain name consists of the legal name of the [alleged cybersquatter] or a name that is otherwise commonly used to identify [the alleged cybersquatter];
> (3) the [alleged cybersquatter's] prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (4) the [alleged cybersquatter's] bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (5) the [alleged cybersquatter's] intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
> (6) the [alleged cybersquatter's] offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the [alleged cybersquatter's] prior conduct indicating a pattern of such conduct;
> (7) the [alleged cybersquatter's] provision of material and misleading false contact information when applying for the registration of the domain name, the [alleged

> cybersquatter's] intentional failure to maintain accurate contact information, or the [alleged cybersquatter's] prior conduct indicating a pattern of such conduct;
>
> (8) the [alleged cybersquatter's] registration or acquisition of multiple domain names which the [alleged cybersquatter] knows are identical or confusingly similar to marks of others that are distinctive at the time of the registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (9) the extent to which the mark incorporated in the [alleged cybersquatter's] domain name registration is or is not distinctive and famous within the meaning of [15 U.S.C. § 1125(c)(1)].

*Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*, 58 F.4th 785, 798 (4th Cir. 2023) (quoting 15 U.S.C. § 1125 (d)(1)(B)(i)). While each of those factors are relevant, the Fourth Circuit has instructed that they are not prescriptive. "None of the factors is individually dispositive, and they should not be added up against one another ...." *Id.* at 798-99. Rather, the cybersquatting statute permits "a court to view the totality of the circumstances in viewing the bad faith determination." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001).

On a different note, Magistrate Judge Fitzpatrick was quite correct to separately analyze the concepts of "bad faith" and "intent to profit." While courts frequently analyze the two concepts simultaneously, there may be cases (like here) when they must be separated out. And separating them is consistent with case law, as the Fourth Circuit has impliedly referred to them as independent legal requirements that a cybersquatting plaintiff must establish. *See, e.g.*, *Lamparello v. Falwell*, 420 F.3d 309, 320 (4th Cir. 2005) ("The use of a domain name to engage in criticism or commentary *even where done for profit* does not alone evidence a bad faith intent to profit" (cleaned up) (emphasis added)); *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 228 (4th Cir. 2002) (stating that a cybsersquatting claim is one for "bad faith registration *with* intent to profit"); *see also Barcelona.com Inc. v. Excelentisimo Ayuntamiento de Barcelona*, 330 F.3d 617, 624 (4th Cir. 2003) (noting that the purpose of the cybersquatting statute is to "protect

consumers and American businesses … by prohibiting the bad faith and abusive registration of distinctive marks as Internet domain names with the intent to profit ….” (quoting S. Rep. No. 106-140 at 4)). As a result, district courts often analyze the “bad faith” and “intent to profit” elements separately, and the Court will do the same here.  *See, e.g.*, *Volvo Trademark Holding AB v. Volvospares.com*, 703 F. Supp. 2d 563, 569 (E.D. Va. 2010) (granting summary judgment when plaintiff had established that defendant registered domain name “in bad faith *with* the intent to profit”).

First, the Court examines the nine factors set forth in 15 U.S.C. § 1125 (d)(1)(B)(i), which it “need not march through … seriatim.”  *Prudential Ins. Co.*, 58 F.4th at 799 (cleaned up).  As Magistrate Judge Fitzpatrick recognized, these factors cut both ways.  Some factors weigh in favor of the registrants:[2] they used the website for “bona fide noncommercial or fair use[,]” *i.e.* criticism of Getir; there is no indication that the registrants have attempted to monetize the domain names; and there are no allegations that the registrants have used these domain names to make money on their own products or services.  But some factors are also in Getir’s favor.  For example, there is no indication that the registrants have any intellectual property rights in the domain names they are using; they have evidently attempted to “cloak their registration details behind a privacy shield,” Dkt. 4 (Declaration of David King) ¶ 14, and they have obtained multiple domain names that utilize Getir’s marks.  However, the fact that those nine factors do not counsel in favor of one finding over the other does not make this Court’s task difficult, as “the most important grounds … ‘are the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress but nevertheless must be considered under the statute.’”  *Virtual Works,*

---

[2] The Court generally refers to those who initially controlled <getir190.com> and <190getir.com> as the “registrants.”

*Inc.*, 238 F.3d at 268 (quoting *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 (2d Cir. 2000)).

Getir contends that the specific circumstances here evidence a "bad faith intent to profit." It points to the "sophisticated nature of the campaign and apparent coordination" as suggesting that the domain names were "controlled by a competitor." Dkt. 67 at 8-9. Getir also cites the apparent "wealth of circumstantial evidence establishing a bad faith intent to profit," noting that because a "bad faith intent to profit is not always transparent," the Court must consider the "totality of the circumstances." *Id.* at 9.

It is important to recall what this Court's task is. Getir has sought a default judgment from this Court, asking it to issue a permanent injunction. As stated above, for Getir to succeed, Getir's Amended Complaint—which the Court evaluates in a manner similar to a 12(b)(6) motion—must include "well-pleaded allegations" to "support the relief" that Getir seeks. *Ryan*, 253 F.3d at 280. In other words, the Court's task is to evaluate whether the well-pleaded allegations in Getir's Amended Complaint indicate that the "unique circumstances of the case" show a bad faith intent to profit. *Virtual Works, Inc.*, 238 F.3d at 268

There are several conclusory allegations that Getir points to as support for its argument that there is an "intent to profit" that this Court need not consider. On multiple occasions, Getir's Amended Complaint includes references to "bad faith intent to profit" amid factual allegations. *E.g.* Dkt. 28 ¶¶ 2, 5, 58, 59. The Court does not accept as true that those factual assertions show a bad faith intent to profit; rather, the Court will independently evaluate the legal relevance of those allegations. Getir also emphasizes that the following allegation supports a bad faith intent to profit:

> 56. Upon information and belief, the registrants of <getir190.com> and <190getir.com> registered <getir190.com> and <190getir.com> with the intent to divert consumers seeking access to genuine Getir services online away from Getir's website at <www.getir.com> for commercial gain by creating a likelihood of

confusion as to the source, sponsorship, affiliation or endorsement of
<getir190.com> and <190getir.com> and the sites displayed through use of
<getir190.com> and <190getir.com>.

Dkt. 65 at 3 (quoting Dkt. 28 ¶ 56).  Such an allegation regarding Plaintiff's belief as to the
registrants' intent is not a factual one, but is conclusory and thus will be disregarded.  *See Harman
v. Unisys Corp.*, 356 F. App'x 638, 640 (4th Cir. 2009) (holding that an allegation made "upon
information and belief" about defendant's belief was conclusory).

An evaluation of Plaintiff's Amended Complaint reveals a dearth of factual allegations
indicating an intent to profit.  What Getir primarily relies on is the effect that the alternate websites
may have on consumers: it claims that the allegedly infringing websites "contain the distinctive
'Getir' name and marks to confuse and divert consumers from the 'Getir' website[,]" Dkt. 28 ¶ 2,
that the registrants "solicit[ed] influencers and others to join their sophisticated campaign[,]" *id.* ¶
5, and that there were flyers distributed throughout the United Kingdom directing individuals to
visit the alternate websites, *id.* ¶¶ 42-43.  *See also id.* ¶ 59 (alleging that the website sought to
direct users to <getir190.com> through "social media and the creation of videos that appear on
YouTube and Vimeo").  But those allegations, by themselves, do not reveal an intent to profit.
Rather, they reveal an intent to direct Getir users to a particular website.  And that website—as
alleged in Plaintiff's Amended Complaint—does not contain information indicating that the
registrants intended to profit from consumers visiting it.  Instead, it only contains statements about
purported safety issues with Getir.  *Id.* ¶¶ 30-33.  Getir has pointed to nothing in the websites
themselves or in the registrants' efforts to divert consumers to those websites that shows an intent
to profit.  That critical failure is exacerbated by the fact that there are no evident commercial
aspects to the alternate website.

11

Getir's reliance on the Declaration of David King does not save it on this front.  Mr. King puts forth the following opinion:

> [T]he approach taken by the entity or entities behind and/or creator (collectively referred to as creator(s)) of Getir190.com not only in respect of the site itself but also in respect of the use of multiple social media platforms, video sharing sites, robotic accounts and technical Search Engine Optimization (SEO)—shows the hallmarks of a sophisticated attack campaign designed to impact the business success, reputation, and goodwill of Getir, conducted by an individual or multiple individuals using methodologically sophisticated techniques.

Dkt. 4 ¶ 10.  Stripped to its core, Mr. King's Declaration states that the registrants of the  allegedly infringing websites conducted a "sophisticated attack campaign designed to impact the business success, reputation, and goodwill of Getir."  *Id.*  Taken as true, that assertion does not mean that the registrants intended to profit *themselves*; it only speaks to their intent to harm *Getir's* ability to profit.  Getir has not offered any allegations that create a reasonable inference that the registrants are competitors or associated with a competitor.  Without such an allegation, the fact that the registrants intended to harm Getir's business prospects does not establish an "intent to profit."  *See Silver Ring Splint Co. v. Digisplint, Inc.*, 567 F. Supp. 2d 847, 857 (W.D. Va. 2008) (intent to profit could be inferred from intent to harm *competitor*).[3]

The circumstances here (as alleged in the Amended Complaint) also instruct against a finding of bad faith intent.  First, the Court agrees with Magistrate Judge Fitzpatrick's conclusion that *Lamparello* is instructive.  *Lamparello* (which was resolved on appeal after summary judgment) involved a plaintiff who created a website to "criticize [the Defendant's] views."  420 F.3d at 320.  And there, the plaintiff's website had *some* purpose that could be construed as

---

[3] There are also no allegations, or reasonable inferences therefrom, that the website is a "pretext disguising an underlying profit motive[.]" *Sylvan Learning, Inc. v. sylvanfranchiseissues.com*, No. 1:11-cv-310, 2011 WL 13234933, at *6 (E.D. Va. Oct. 27, 2011).

"commercial" as it linked to an "Amazon.com webpage selling a book he favored …." *Id.* But because the plaintiff there was commenting on and criticizing the defendant's actions, and "did not even stand to gain financially from the sales of the book[,]" the Fourth Circuit was inclined to find for plaintiff. *Id.* As Magistrate Judge Fitzpatrick found, and in line with *Lamparello*, the websites here are "gripe site[s]" that "criticiz[e] [Getir]" and as a result do not "constitute cybersquatting." *Id.* at 322.[4]

Second, there are also insufficient allegations indicating bad faith intent. The bad faith requirement is intended to further Congress's purposes in passing the cybersquatting statute, which include, *inter alia*: (1) preventing the "registration of multiple marks with the hope of selling them to the highest bidder" and (2) eliminating "consumer confusion caused by misusing [a] domain name to diver[t] customers from the mark owner's site to the cybersquatter's own site[.]" *NSCO v. Colby_Exon, LLC*, No. 3:16-cv-848, 2018 WL 1568684, at *11 (E.D. Va. Mar. 20, 2018). Nothing in the record indicates that the registrants hoped to sell the domain names to the highest bidder or divert individuals from Getir's site to their own. Moreover, there are no allegations that the registrants "register[ed] a variety of domain names" with no intent to actually "use them[,]"

---

[4] Getir quibbles with Magistrate Judge Fitzpatrick's reliance on *Lamparello* for two principal reasons. First, it argues that *Lamparello* is limited to political speech on websites. Dkt. 65 ¶ 19. Second, it argues that *Lamparello* is distinguishable because there, the defendant did not offer any evidence that plaintiff "engaged in the type of conduct described in the [nine] statutory factors that would indicate … a bad faith intent to 'profit'." *Id.* ¶ 20 (quoting *Lamparello*, 420 F.3d at 320.

Both arguments are unavailing. First, nothing in *Lamparello* limits its holding to political views espoused on gripe sites. Indeed, the Fourth Circuit relied on two cases from the Fifth and Sixth Circuits that did not involve political speech. *Lamparello*, 420 F.3d at 321 (citing *TMI, Inc. v. Maxwell*, 368 F.3d 433, 434-35 (5th Cir. 2004) and *Lucas Nursery and Landscaping, Inc v. Grosse*, 359 F.3d 806, 810-11 (6th Cir. 2004)). Second, the *Lamparello* court did not wholly rely on the nine statutory factors, and neither does this Court. While the factors are relevant, they are not dispositive.

[which] is a key factor in the bad faith determination." *Domain Name Clearing Co., LLC v. F.C.F. Inc.*, 16 F. App'x 108, 111 (4th Cir. 2001).

In sum, the circumstances alleged here, taken as a whole, do not indicate a bad faith intent to profit.  The facts alleged show that the registrants' attempts to "attract previous and potential [Getir] customers to [their] websites to inform them about" purported safety issues with Getir was motivated by the registrants' desire to "voice [their] strong criticisms about [Getir], provide a forum for others to voice criticisms, and, if possible, prevent others from ending up in [their] situation." *Fairbanks Cap. Corp. v. Kenney*, 303 F. Supp. 2d 583, 595 (D. Md. 2003).  As a result, there is little evidence of bad faith or an attempt to profit, as the websites at issue appear to be "legitimate gripe sites" rather than "attempt[s] to cash in on the registration of … domain name[s] … desirable to [P]laintiff." *Sylvan Learning, Inc.*, 2011 WL 13234933 at *5.  Accordingly, Plaintiffs have not pleaded a "bad faith intent to profit," a critical element of their cybersquatting claim.

## IV. CONCLUSION

For the reasons set forth above, this Court ADOPTS Magistrate Judge Fitzpatrick's Report and Recommendation (Dkt. 66) in full and REJECTS Plaintiff's Objection to the R&R (Dkt. 67); and it is

FURTHER ORDERED that Plaintiff's Motion for Default Judgment (Dkt. 68) is DENIED; and it is

FURTHER ORDERED that this Court's Preliminary Injunction (Dkt. 41) is DISSOLVED in all respects; and it is

FURTHER ORDERED that Plaintiffs shall take the necessary steps to return ownership and control of <190getir.com> and <getir190.com> to Verisign, Inc., who shall return ownership and control to the prior registrants; and it is

FURTHER ORDERED that within twenty-one days of this Memorandum Opinion and Order, Plaintiffs must inform the Court whether they intend to continue to prosecute this civil action.

IT IS SO ORDERED.

Alexandria, Virginia
June 8, 2023

_____ /s/
Rossie D. Alston, Jr.
United States District Judge